## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PROFIT POINT TAX TECHNOLOGIES, INC., | Case No. 2:19-cv-00698-WSS-MPK |
| Plaintiff, | Filed Electronically |
| v. | |
| DPAD GROUP, LLP, JOHN MANNING and DANIEL STEELE, | |
| Defendants. | |
| DPAD GROUP, LLP, JOHN MANNING and DANIEL STEELE, | |
| Counter/Plaintiffs, | |
| v. | |
| PROFIT POINT TAX TECHNOLOGIES, INC. and PATRICK J. SWEET, | |
| Counter/Defendants. | |

## DEFENDANTS/COUNTER-PLAINTIFFS DPAD GROUP, LLP, JOHN MANNING AND DANIEL STEELE'S OBJECTIONS TO REPORT AND RECOMMENDATION ON MOTIONS TO COMPEL FORENSIC EXAMINATION [ECF NO. 179]

Defendants/Counter-Plaintiffs DPAD Group, LLP ("DPAD"), John Manning ("Manning") and Daniel Steele ("Steele") (collectively, the "Defendants") file these Objections to Special Master Betts' Report and Recommendation (the "R&R," *see* ECF No. 179) granting, in part, two (2) motions to compel filed by Plaintiff/Counter-Defendant Profit Point Tax Technologies, Inc. ("PPTT") (collectively, "PPTT's Motions"): (1) a motion to compel a forensic examination of the Defendants' ESI relating to certain so-called "Boston Documents," *see* ECF No. 153; and (2) a motion to compel a forensic examination of the Defendants' ESI relating to documents improperly subpoenaed from Global Tax Management, Inc. ("GTM"), *see* ECF No. 158.

## **<u>INTRODUCTION</u>**

The Court should reject the R&R and deny PPTT's Motions.   In PPTT's Motions, PPTT falsely claimed the Defendants failed to produce "768 known responsive documents[.]"   *See* ECF No. 158 at 1.   The R&R largely rejected that claim, finding that at least 706 of these documents clearly were *not* responsive to PPTT's discovery requests.   The Special Master found that 62 of the 768 documents were *arguably* responsive and recommended that the Court order a forensic examination of the Defendants' computers and ESI.

Respectfully, as discussed herein, this recommendation is wrong as a matter of law; based on intentionally misleading information provided by PPTT; and wholly unwarranted given the status of this case and the nature of the documents in question.[1]   Moreover, pursuant to the terms of the Defendants' agreements with its clients, the proposed sanction would require notice to and an opportunity to be heard by dozens of publicly traded corporations wholly unrelated to this litigation.   *See* Declaration of John Manning ("Manning Decl."), attached as **<u>Exhibit 1</u>**, ¶ 3; Declaration of Daniel Steele ("Steele Decl."), attached as **<u>Exhibit 2</u>**, ¶ 3.

The R&R recommended a forensic examination—relief the Special Master has correctly characterized as a *sanction*—even though the Defendants have never committed a single discovery violation, let alone the multiple discovery violations that prevailing law *requires* before imposing sanctions.   The Court may reject the R&R and deny PPTT's Motions on this basis alone.

Despite expressly recognizing significant issues with their authenticity, the R&R improperly relied on a very limited number of so-called "Boston Documents" as a basis for a forensic examination.   The R&R effectively shifted the burden to the Defendants with respect to

---

[1] Although PPTT initially was granted a broad scope of discovery by Magistrate Judge Kelly based on PPTT's assertion that there were 30 companies as to which PPTT potentially was owed money, the scope of this litigation has been narrowed to *one* tax project performed for *one* company—Exelon.

explaining the Boston Documents, even though Magistrate Judge Kelly previously ruled that the Defendants were not permitted to develop a full and complete record on them.  The unfairness here is glaring.  In any event, the R&R found 13 Boston Documents to be *arguably* responsive to PPTT's discovery requests.  These determinations fail to account, however, for directly applicable discovery rulings in this case and misapprehend the content of these unauthenticated documents.

The R&R also improperly considered documents PPTT subpoenaed from GTM in plain violation of Fed. R. Civ. P. 45 and this Court's Orders.  PPTT's violations jeopardize the integrity of the judicial process and risk injury to the public. As discussed herein, nearly half of the 49 GTM documents the R&R determined to be arguably responsive to PPTT's discovery requests are not within the Defendants' possession.  The remainder of these documents are categorically *not* responsive to any of PPTT's discovery requests.  The R&R does not identify any of PPTT's discovery requests directed to the Defendants to which these documents are responsive.

In recommending that PPTT be awarded its attorneys' fees associated with PPTT's Motions, the R&R applied the wrong legal standard—Fed R. Civ. P. 37(a)(5)(A)—the same legal standard the Special Master previously determined was *inapplicable* to PPTT's identical request for relief here.  The correct legal standard to evaluate the request for *sanctions* in PPTT's Motions is Fed. R. Civ. P. 37(b)(2)(C), as the Special Master previously found.  Not only did the Special Master apply the incorrect legal standard to PPTT's request for relief, he misapplied Fed R. Civ. P. 37(a)(5)(A), recommending that PPTT be awarded its attorneys' fees because the Defendants allegedly refused to conduct ESI searches pursuant to terms proposed by PPTT.  No Court Order, however, *required* the Defendants to conduct additional ESI searches.  *More critically, the search terms PPTT proposed to the Defendants—which PPTT concealed from the Special Master— spanned nine (9) pages and contained exceedingly broad, harassing, and plainly inappropriate*

*search terms.  The Defendants rightfully refused to agree to such outrageous terms.*  It is the Defendants who deserve to be awarded their attorneys' fees, not PPTT.

## LEGAL STANDARDS

This Court must review the R&R under a *de novo* standard of review.  *See* ECF No. 112 at 2 ("The Special Mater's recommendations will be reviewed *de novo.*"); ECF No. 166 (assigning PPTT's Motions to the Special Master).  "De novo review means the district court must consider the matter referred to [the Special Master] anew, as if it had not been heard before and as if no decision previously had been rendered.  The district court must arrive at its own independent conclusion about those portions to which objections are made."  *See Kramer v. City of New Kensington*, Civil Action No. 13-606, 2015 WL 5672640, at *7 (W.D. Pa. Sept. 25, 2015).

PPTT's Motions are styled as motions to compel.  *See* ECF Nos. 129 and 153.  As the Special Master previously found and as this Court previously agreed, this is incorrect.  *See* ECF Nos. 137 and 152.  PPTT's Motions are *not* motions to compel but rather requests for *sanctions* associated with alleged discovery violations.  *See* R&R at 7 (citing ECF No. 137 at 5-6).

For instance, in *Marsulex Environmental Tech. v. Selip S.P.A.*, Civil No.: 1:15-CV-00269, 2019 WL 2184873, at *12 (M.D. Pa. May 21, 2019) (citing *Brooks Grp. & Assocs., Inc. v. Levigne*, Civil Action No. 12-2922, May 17, 2013 Memorandum at *2 (E.D. Pa. May 17, 2013)), the court, applying Fed. R. Civ. P. 37(b)(2), described a forensic investigation as a "non-routine 'intrusion' that may be ordered 'as a *sanction* after a litigant has failed to preserve evidence, equivocally responded to discovery or otherwise resisted discovery.'"  (Emphasis added).  Indeed, the court held that a litigant's "failure to preserve evidence [was] the *only* reason that such an investigation [was] necessary."  *See Marsulex*, 2019 WL 2184873, at *12 (emphasis added).

Similarly, in *Brooks Grp. & Assocs., Inc. v. Levigne*, Civil Action No. 12-2922, 2013 WL 3557258, at *2 (E.D. Pa. July 15, 2013), which is similar to the posture underlying PPTT's Motions, the court denied a motion for reconsideration of the court's previous denial of a motion to compel seeking forensic investigation of the plaintiff's computer system (the decision cited in *Marsulex*) because case law was clear that "it is not routine for federal district courts to order forensic examinations of a litigant's computer systems.  Instead, this intrusion may be ordered *as a sanction* after a litigant has failed to preserve evidence, equivocally responded to discovery or otherwise resisted discovery."  (Emphasis added).  All of the cases cited in *Marsulex* were based on a litigant's deleting and withholding ESI.  *See* 2019 WL 2184873, at *12 (collecting cases).

Moreover, a court is authorized to impose sanctions under Fed. R. Civ. P. 37(b)(2)(A) only when a party fails to "obey an order to provide or permit discovery."  (Emphasis added); *Osorio v. TCV Community Servs.*, Civil Action No. 19-660, 2020 WL 5653347, at *3 (W.D. Pa. Sept. 22, 2020) ("Federal Rule of Civil Procedure authorizes a court to impose sanctions against a party that fails to comply with a court order.").  Indeed, this Court has recognized that sanctions under Fed. R. Civ. P. 37(b)(2)(A) are reserved for litigants who have engaged in *multiple* discovery violations. *Id.* at *4 ("It is also recognized that a party subject to a sanction under Rule 37(b)(2) generally has engaged in multiple discovery violations." (citations omitted)); *Hepler v. Wetzel*, Civil Action No. 18-446, 2020 WL 1952677, at *4 (W.D. Pa. Apr. 23, 2020) (same); *see also Cory v. George Carden International Circus, Inc.*, Civil Action No. 4:13-CV-760, 2016 WL 3460781, at *2 (E.D. Tex. Feb. 5, 2016) (relying on fact that only one other motion to compel had been filed against the party against whom sanctions were sought, which suggested that the party had been cooperative in the discovery process, in denying motion for sanctions seeking imaging of electronic devices).

## **OBJECTIONS**

I.  **THE R&R IMPROPERLY RECOMMENDED A *SANCTION*—A FORENSIC EXAMINATION OF THE DEFENDANTS' COMPUTERS AND ESI—WITHOUT FINDING *ANY* DISCOVERY VIOLATION, LET ALONE THE *MULTIPLE* VIOLATIONS THIS COURT REQUIRES.**

The R&R fails to identify a single discovery violation committed by the Defendants, let alone the multiple discovery violations necessary for this Court to impose sanctions under Fed. R. Civ. P. 37(b)(2).  The R&R's recommendation that the Court order a forensic examination of the Defendants' computers and ESI is premised on discovery "*concerns*" rather than discovery *violations*.  *See* R&R at 16 (emphasis added); *see also id.* at 17 (offering reasons for recommending an order requiring a forensic examination of the Defendants' computers and ESI, *none* of which include a discovery violation).  This Court has never found that the Defendants committed a discovery violation, as each of PPTT's prior motions to compel have all been denied.  *See* ECF Nos. 114, 137, 128, and 152.[2]  The R&R itself did not find that the Defendants committed a discovery violation.  The threshold requisite *multiple* discovery violations by the Defendants have never been identified to even warrant the consideration of sanctions, let alone recommend them. The R&R therefore erred in recommending the *sanction* of ordering a forensic examination when the Defendants have not committed any discovery violations, let alone multiple discovery violations as this Court requires.  *See* R&R at 17-20; *Osorio*, 2020 WL 5653347, at *3; *Hepler*, 2020 WL 1952677, at *4; *Cory*, 2016 WL 3460781, at *2.

An express finding of sanctions, based on multiple discovery violations, is a condition precedent before even conducting an analysis of whether to order a forensic examination.  The Special Master ignored the threshold need to find multiple discovery violations and instead

---

[2] Moreover, the Special Master has recommended that PPTT's motion to compel the continued depositions of the Defendants also be denied.  *See* ECF No. 178.

incorrectly formulates the relevant law, stating that "District courts in this Circuit have observed that forensic examinations may be ordered not only as a sanction for failure to preserve evidence, but also when a party has 'equivocally responded to discovery or otherwise resisted discovery.'" *See* R&R at 17-18 (quoting *Marsulex*, 2019 WL 2184873, at *12).  As discussed above, however, a forensic examination may *only* be ordered as a *sanction*.[3]  *See Marsulex*, 2019 WL 2184873, at *12 (noting that a forensic examination "may be ordered 'as a *sanction after* a litigant has failed to preserve evidence, equivocally responded to discovery or otherwise resisted discovery.'" (quotation omitted) (emphasis added)).  Even when a forensic examination is ordered because a party has equivocally responded to or otherwise resisted discovery, the Court must first find that sanctions, based on multiple discovery violations, are warranted.  *See id.*  Indeed, contrary to the R&R's suggestion, a forensic examination may only be ordered: (1) as a *sanction after* a party fails to preserve evidence; (2) as a *sanction after* a party equivocally responds to discovery; or (3) as a *sanction after* a party otherwise resists discovery.  *See id.*  The Defendants have not equivocally responded to or otherwise resisted discovery; and even if they had (which they have not) a forensic examination, as a matter of law, may *not* be ordered after a party equivocally responds to or resists discovery *absent* circumstances warranting *sanctions*, *i.e.*, *multiple* discovery violations.  *See id.*

The only cases from the Third Circuit cited in the R&R are inapposite.  *See* R&R at 17-18.  In *Marsulex*, the litigant's "failure to preserve evidence [was] the *only* reason that such an investigation [was] necessary."  *See* 2019 WL 2184873, at *12 (emphasis added).  In *Adhi Parasakthi Charitable, Med., Ed., and Cultural Soc'y of N. Am. v. Twp. of West Pikeland*, Civil Action No. 09-CV-1626, 2010 WL 1047894, at *8 (E.D. Pa. Mar. 16, 2010), the court did not impose any sanction at all under Fed. R. Civ. P. 37, let alone a third-party forensic examination,

---

[3] In PPTT's Motions, spoliation of evidence was the only basis upon which PPTT moved to compel a forensic examination.  That basis has been proven demonstrably false.

but rather required an inspection under Fed. R. Civ. P. 34(b).  Indeed, in *Brooks Grp.*, the court

relied on *Adhi* and *Bank of Mongolia v. M&P Global Fin. Serv., Inc.*, 258 F.R.D. 514, 519-22

(S.D. Fla. 2009) (upon which the R&R also relied) to hold that the sanction of ordering a forensic

examination was *not* appropriate.  *See* 2013 WL 3557258, at *2.  In *Brooks Grp.*, like here, there

were no "discovery violations by [the non-moving party]."  *Id.* Because this Court requires

*multiple* discovery violations prior to sanctioning a party, the sanction of a forensic examination

is inappropriate in this case where the Defendants have not committed *any* discovery violations.

## II.    THE R&R ERRED IN RELYING ON THE ALTERED, UNAUTHENTICATED, AND NON-RESPONSIVE "BOSTON DOCUMENTS" IN RECOMMENDING A FORENSIC EXAMINATION.

In recommending a forensic examination, the R&R improperly relied on the so-called

Boston Documents, only 13 of which the Special Master found to be *arguably* responsive to

PPTT's discovery requests (which the Defendants nevertheless refute below).

### A.    The R&R Improperly Shifted the Burden to the Defendants Regarding the Boston Documents, Despite PPTT and this Court Preventing the Defendants From Obtaining Discovery Relating to the Boston Documents.

The uncontroverted record before the Court establishes that: (1) the Boston Documents,

many of which contained indisputable and verifiable indicia of fabrication or alteration, were in

the possession of PPTT's counsel at some point prior to October 30, 2020; (2) the handwriting on

the mailing envelope that allegedly contained the Boston Documents appears to be that of Patrick

J. Sweet ("Sweet"), PPTT's president and sole shareholder; (3) PPTT's counsel did nothing to

authenticate the Boston Documents—he elected not to provide basic information regarding their

source when asked by the Defendants' counsel; elected not to present a single Boston Document

to any of the Defendants at their depositions on November 17-19, 2020; and elected to not

subpoena Deloitte, the *purported* sender of the Boston Documents; (4) PPTT did not include the

Boston Documents in its first motion to compel a forensic examination; and (5) PPTT's counsel, and this Court, expressly prohibited counsel for the Defendants to question Sweet and PPTT regarding the Boston Documents.  *See* ECF No. 157.

Despite noting that there were "substantial questions about [the] authenticity" of the Boston Documents, *see* R&R at 13, the R&R nevertheless erroneously shifted the burden from PPTT to the Defendants to "identify any emails from within the Boston Documents that they believe were not sent or received in an un-doctored form[,]" *id.* at 14.  Rather than requiring PPTT to present evidence to carry its burden (again, PPTT did not attempt to, and in fact obstructed, the development of any evidence), the R&R relied on something referred to as a "logical inference" from what the *Defendants* did *not* assert as the basis for its recommendation even though the burden to identify evidence to carry its burden rests with PPTT, not the Defendants.  *Id.* at 14. This "logical inference" is very different from the "clear showing" the Special Master determined *PPTT* was required to make but did not make in denying PPTT's first motion to compel a forensic examination.  *See* ECF No. 137 at 6 ("Because court-ordered forensic computer examinations are intrusive, courts have expressed reluctance to grant them *absent a clear showing* that the responding party has failed to comply with its discovery obligations." (emphasis added)).  Again, the application of different standards and evidentiary showings to the identical request for relief is glaringly unfair and cannot be supported by this Court.

Simply put, the R&R improperly and inexplicably shifted the burden to the Defendants regarding the Boston Documents, despite the Special Master's earlier ruling and the fact that the Defendants were prevented by the Court from developing evidence, the lack of which the Special Master expressly cites as a basis for his recommendations.

**B.     The Thirteen (13) Boston Documents on Which the R&R Relied Do Not Provide Any Basis For a Forensic Examination.**

Notwithstanding the R&R's improper burden shifting, the 13 Boston Documents on which the R&R relies do not support the recommendation for a forensic examination.   These 13 documents, filed at ECF No. 153-5, can be categorized as documents purporting to relate to: Marmon, Consol Energy ("Consol"), and Exelon.   *See* Manning Decl. ¶ 5.

**i.     "Responsive" Boston Documents Relating to Marmon.**

There are 4 Boston Documents that relate to Marmon (*see* Deloitte000028-Deloitte000030, Deloitte000031, Deloitte000033, and Deloitte000035).[4]   As to the 4 documents in question, the R&R ignored the fact that Magistrate Judge Kelly determined, and this Court affirmed, that the Defendants were not required to produce communications by and between the Defendants, Urish Popeck, and/or Marmon regarding payment for work performed for Marmon because their relevance had not been established.   *See* ECF No. 69 at 5 (holding that the Defendants did not need to respond to RFP No. 12, which requested "[a]ny and all documents which relate to or reference communications by and between DPAD, Manning, Steele, Urish Popeck and/or Marmon Industries, and any of their agents or principals, regarding payment for work performed for Marmon Industries[,]" *see* ECF No. 153-2, "on the basis that the relevance of the request has not been established[.]").   Indeed, any dispute relating to Marmon was expressly resolved in the Master Fee Splitting Agreement and Release of Claims dated February 2, 2016 (the "Release," *see* ECF No. 16-1) and therefore has no relevance to this case.   Magistrate Judge Kelly reaffirmed the determination that Marmon was not relevant to this case in denying PPTT's Motion to Compel the Deposition of Ken Urish at the most recent status conference on March 1, 2021.   *See* ECF No. 177.

---

[4] Deloitte000028-Deloitte000030 is a single document consisting of three pages, which PPTT Bates stamped as three documents; and Deloitte000035 and Deloitte000060 are the same document, which PPTT Bates stamped twice under separate Bates numbers.

The R&R determined that the 4 Boston Documents relating to Marmon arguably were responsive to RFP Nos. 1(3) and 1(7), which generically requested all communications with Urish Popeck or Ken Urish, respectively, relating to solicitation of potential clients, introduction to potential clients, payment arrangements, fee splits, payments made, and marketing materials for 28 different companies, including Marmon. *See* ECF No. 153-2. These RFPs must be read in conjunction with the Court's determination that Marmon is not relevant to this case. *See* ECF No. 69 at 5; ECF No. 153-2. The R&R failed to do so.

In the case of Deloitte000031, the Defendants do not possess this document in any form and therefore could not have produced it. *See* Manning Decl. ¶ 9; Steele Decl. ¶¶ 5-6. Deloitte000028-Deloitte000030 purports to be a *draft* memorandum that apparently was not communicated to Urish Popeck or Ken Urish. *See* Manning Decl. ¶ 10. Indeed, there is no associated e-mail transmittal, and PPTT concedes that Urish Popeck did not produce this document in response to its subpoena to Urish Popeck. *See* ECF No. 153-4. Deloitte000033 and Deloitte000035 purport to be October 2015 e-mails—allegedly sent months *before* the parties entered into the Release expressly resolving Marmon issues—relating to invoices and fees for Marmon. *See* Manning Decl. ¶ 11. The purported content of these e-mails is exactly what this Court determined need not be produced because it is not relevant to this case and is what the parties expressly released years ago. Deloitte000033 purports to be an email from Steele to Ken Urish informing Urish that PPTT's attorney (Ronald M. Trachtenberg, Esquire) proposed separate invoicing by PPTT and Urish Popeck, which essentially is how the matter was resolved under the Release. *See* Manning Decl. ¶ 12. Deloitte000035 purports to be an email in which Steele encouraged Ken Urish to contact Marmon. *See* Manning Decl. ¶ 13. The Defendants do not know

if any such contact ever occurred; and the dispute as to the proper invoicing and fee sharing on Marmon projects was resolved under the Release.  *See* Manning Decl. ¶ 14.

    **ii.**    **"Responsive" Boston Documents Relating to Consol.**

    With respect to the Boston Documents that purportedly relate to Consol (*see* Deloitte000037-Deloitte000043), the R&R ignored the fact that in 5 of the 7 pages relating to Consol (one of which appears to be a duplicate), there are no dates on the purported e-mails.  *See* Deloitte000037, Deloitte000040-Deloittee000043.  As this Court knows, Magistrate Judge Kelly determined, and this Court affirmed, that the discoverable time period in this case is 2014 to the present.  *See* ECF No. 69 at 4.  There is nothing in the record demonstrating when these e-mails were purportedly sent, and the Defendants were expressly denied the opportunity to explore them by Magistrate Judge Kelly.  The R&R therefore erred in relying on them.

    With respect to the 2 documents purportedly dated July 22, 2015, the content of these e-mails relates to a meeting between Steele and John Sommer of Consol with respect to a tax liability settlement offer anticipated "from [IRS] Appeals[.]"  *See* Deloitte000038-Deloitte000039.  Like with the Boston Documents relating to Marmon, the R&R determined that all the Boston Documents relating to Consol were responsive to RFP Nos. 1(3) and 1(7), which, again, generically requested all communications with Urish Popeck or Ken Urish, respectively, relating to solicitation of potential clients, introduction to potential clients, payment arrangements, fee splits, payments made, and marketing materials for 28 different companies, including Consol. Nothing on the face of Deloitte000038-Deloitte000039 contains any information responsive to RFP Nos. 1(3) and 1(7) whatsoever.[5]

---

[5] In addition to being not responsive, any documents pertaining to Consol categorically have nothing to do with this litigation since Consol has never been a client of PPTT.  *See, e.g.*, October 14, 2020 PPTT/Sweet Deposition Transcript Excerpt ("PPTT/Sweet Depo. Tr. Vol. II"), attached as **Exhibit 3**, at 518:6-522:21 (testifying that none of the companies listed in PPTT's RFP No. 1 are current PPTT clients and only a handful, not including Consol, were former

### iii.    "Responsive" Boston Documents Relating to Exelon.

Like the Boston Documents that purportedly relate to Marmon and Consol, the 5 Boston Documents that purportedly relate to Exelon (*see* Deloitte000009, Deloitte000016-Deloitte000018, Deloitte000026) do not warrant a forensic examination.  First, the R&R found that Deloitte000009 was responsive to RFP No. 1(2), which requested all documents relating to communications *with* Governor Ridge or his agents regarding 28 entities, including Exelon.  However, Deloitte000009 is a purported e-mail exchange between Manning and Exelon, *not* Governor Ridge.[6]  The R&R found that Deloitte000016 was responsive to RFP Nos. 1(10) or 1(20), which requested documents relating to communications with any other entity or between Manning and Steele, respectively, relating to the *solicitation* of any of 28 entities, including Exelon, as a client to provide tax services.  However, Deloitte000016 is merely a purported e-mail exchange between Manning and Steele in which Manning asks Steele if he received an e-mail that Manning had just sent to Exelon regarding an IRS Form W-9.  This purported e-mail does not relate to the *solicitation* of Exelon, but rather a clerical administrative task.  Third, there is no date on the purported e-mail in Deloitte000017, and, therefore, nothing in the record indicates it is responsive and within the timeframe of permissible discovery set by Magistrate Judge Kelly.  The R&R found this purported e-mail to be arguably responsive to RFP No. 1(2), described above, even though it was not exchanged *with* Governor Ridge but rather between Manning and Steele.  Fourth, Deloitte000018 is merely a purported e-mail from Steele to Manning stating "made 5 color copies for tomorrow" and purportedly attaching a PowerPoint with the filename "Exelon_199_Review.pptx."  The Defendants produced a PowerPoint with this same filename.

---

PPTT clients).  Consol was a Urish Popeck client and PPTT entered into a settlement agreement with Urish Popeck covering all projects performed for Consol.  *See* Manning Decl. ¶ 15; Steele Decl. ¶ 7.

[6] The contents of Deloitte000009 purport to relate to an inquiry as to whether the IRS had taken any action with respect to a tax refund claim.  *See* Manning Decl. ¶ 16.

*See* Manning Decl. ¶ 17 (citing DPAD0000252-DPAD0000257).  The purported, non-substantive cover e-mail from Steele to Manning is not responsive to RFP Nos. 1(15) or 1(20) on which the R&R relied, and to the extent the PowerPoint is responsive, the Defendants produced it.  Last, the Defendants do not possess Deloitte000026.[7]  *See* Manning Decl. ¶ 18; Steele Decl. ¶¶ 5-6.

## III.    THE SPECIAL MASTER ERRED IN RELYING ON THE IMPERMISSIBLY AND IMPROPERLY SUBPOENAED AND NON-RESPONSIVE GTM DOCUMENTS IN RECOMMENDING A FORENSIC EXAMINATION.

In recommending a forensic examination, the Special Master improperly ignores PPTT's blatant violations of the requirements in Fed. R. Civ. P. 45 in subpoenaing GTM, and then incorrectly determines that the substance of 49[8] of the documents produced by GTM "*appear* to be responsive" to PPTT's discovery requests to Defendants.  *See* R&R at 12 (emphasis added).  This Court cannot ignore these errors and must sustain Defendants' Objections to the R&R.

### A.    The R&R Improperly Considered the GTM Documents Even Though PPTT Subpoenaed GTM in Violation of Fed. R. Civ. P. 45 and this Court's Orders.

Federal Rule of Civil Procedure 45(a)(4) requires a party issuing a subpoena commanding documents to serve notice and a copy of the subpoena on each party.  *See also CedarCrestoen Inc. v. Affiliated Computer Servs. LLC*, Misc. No. 1:14-MC-0298, 2014 WL 3055355, at *6 (M.D. Pa. July 3, 2014).  It is undisputed that PPTT did not provide the Defendants with notice of the subpoena it served on GTM on November 24, 2020.  It is therefore undisputed that PPTT violated Fed. R. Civ. P. 45(a)(4) and this Court's Order requiring discovery to be served within sufficient time to allow for a response *prior to* the close of discovery on December 4, 2020.  *See* ECF No. 165 at 17-18.  The R&R does not find differently.  *See* R&R at 14-15.  Had the Defendants received

---

[7] Moreover, the contents of the email are not responsive as they consist merely of Manning purportedly stating he received an "encouraging update" from Exelon about the status of their IRS audit.  No party disputes that a refund claim was filed and resolved, or that the Defendants were paid for their services.

[8] While the R&R references "at least forty," it appears that the Bates ranges cited in the R&R include forty-nine (49) separate documents.  *See* R&R at 12.

the requisite notice as required by the Fed. R. Civ. P. 45(a)(4), they would have promptly moved for a protective order because the discovery was being sought beyond the discovery requirements imposed by this Court, which was consistent with PPTT's past efforts to compromise the integrity of the Court's processes by failing to notice or otherwise inform counsel for the Defendants of the third-party discovery it was pursuing, an issue raised with Magistrate Judge Kelly on at least two occasions prior to PPTT's latest transgression.

"District Courts in this Circuit have consistently applied Rule 45's service requirement strictly." *Yarus v. Walgreen Co.*, Civil Action No. 14-1656, 2015 WL 4041955, at *2 n.5 (E.D. Pa. July 1, 2015) (collecting cases). The reason for this strict application was aptly stated by Judge Robreno in *Spencer v. Steinman*, 179 F.R.D. 484, 489 (E.D. Pa. 1998), *order vacated in part on other grounds on reconsideration*, 1999 WL 33957391 (E.D. Pa. Feb. 26, 1999). There, Judge Robreno noted that "the injury resulting from attorney misuse of the subpoena power is not limited to the harm it inflicts upon the parties. Rather, misuse of the subpoena power also *compromises the integrity of the court's processes*. With the power to coerce production goes the 'increased responsibility and liability for the misuse of the power.' Therefore, the failure to provide prior notice to [parties] of the subpoenas to non-parties also cause[s] injury to the public." *Id.* (emphasis added). Therefore, the Special Master clearly erred in even entertaining PPTT's arguments with respect to the GTM Documents as they are the product of admittedly improper discovery by PPTT. The Court cannot allow PPTT to benefit from knowingly violating and ignoring those provisions of Fed. R. Civ. P. 45 and this Court's Order. Such a result would amount to this Court's endorsement of conduct which "compromises the integrity of this Court's processes" and injures the public's confidence in these processes. *See Spencer*, 179 F.R.D. at 489.[9]

---

[9] The abuse of the subpoena power by PPTT's counsel in this case is clear and egregious. Not only did PPTT's counsel violate Fed. R. Civ. P. 45, but it did so with respect to a third-party that has no relevance whatsoever to Exelon or any

While the Special Master correctly states that the Defendants did not pursue any motion with respect to the improperly subpoenaed GTM documents, the Defendants ultimately chose not to do so: (1) *because these documents have no relevance to this case* and the Defendants did not want to burden the Court with another motion; and (2) based on counsel for PPTT's failure to inform the Court and the Defendants at the January 25, 2021 post-discovery status conference that PPTT would be filing a *third* motion to compel a forensic examination relating to the GTM documents when Magistrate Judge Kelly asked counsel to identify all outstanding issues that needed to be resolved before finalizing a briefing schedule for summary judgment.  *See* ECF No. 150.  This Court should not penalize the Defendants for PPTT's lack of transparency and candor.

**B.     The 49 GTM Documents on Which the Special Master Relied Do Not Provide Any Conceivable Basis For a Forensic Examination.**

Setting aside the R&R's improper consideration of the GTM documents, the substance of the 49 GTM documents which, according to the Special Master, "*appear* to be responsive" to PPTT's discovery requests, do not warrant a forensic examination.  *See* R&R at 12 (emphasis added).  These 49 documents are filed under seal at ECF Nos. 164 and 168, and a thorough review of each is now required in light of the significant sanction the Special Master is recommending.

As a threshold matter, the R&R fails to acknowledge that the Defendants produced dozens of documents relating to GTM on July 20, 2020, many of which were included within the 49 documents on which the R&R relied to recommend a forensic examination, a fact that was not disclosed to the Special Master by PPTT.  Moreover, none of the GTM documents the Defendants produced were presented to the Defendants during their depositions because they are clearly beyond the scope of permissible discovery set by Magistrate Judge Kelly or completely irrelevant

---

other tax project as to which PPTT asserts a right to payment.  Thus, the subpoena not only was sent in violation of Fed. R. Civ. P. 45, but it was also sent solely for the impermissible purposes of conducting a fishing expedition and attempting to prevent the Court from resolving this case based on its merits.

to any claim or defense in this case.  In fact, the only testimony that counsel for PPTT elicited from the Defendants relating to GTM during three full days of depositions is that DPAD "got paid" on two projects procured through GTM—MSA and Globus Medical—<u>neither of which PPTT claims is a former or current client of PPTT, or even at issue in this case.</u>

The Special Master found *not* responsive hundreds of GTM documents which PPTT incorrectly and recklessly alleged were withheld from production by the Defendants.  That effort by the Special Master identified 49 documents produced by GTM which "*appear* to be responsive" to PPTT's discovery requests.  The Defendants have taken the following additional voluntary steps—which have never been ordered or required by the Special Master or the Court—to confirm the completeness and accuracy of its document production: (1) the individual Defendants personally reviewed every one of the 49 GTM documents in detail; (2) the Defendants re-reviewed the documents it collected for potential production in this case; (3) utilizing the same broadly-recognized Relativity e-discovery tool that they used for their initial review and production, the Defendants' counsel conducted a targeted search for these documents across the entire DPAD document collection; and (4) the Defendants conducted a broad search of their systems for these specific documents.  The results are clear.  There is no evidence that the Defendants failed to preserve evidence; equivocally responded to discovery; or otherwise resisted discovery to warrant the sanction of a forensic examination of the Defendants' computers and ESI by a third party.

The Defendants do not possess 23[10] of the 49 GTM documents on which the R&R relied to recommend a forensic examination.  *See* Manning Decl. ¶ 19; Steele Decl. ¶ 8.  Moreover, unlike with the Boston Documents, the Special Master does not identify a single discovery request

---

[10] These 23 documents the Defendants do not possess are: GTM00039, GTM00040, GTM00138, GTM00141, GTM00144, GTM00266, GTM00617, GTM00638, GTM00701, GTM00712, GTM00758, GTM00827, GTM00860, GTM01002, GTM01036, GTM01176, GTM01214, GTM01265, GTM01349, GTM01375, GTM01393, GTM01650, GTM01718.  *See* Manning Decl. ¶ 19; Steele Decl. ¶ 8.

to which the GTM documents are allegedly responsive.  *See* R&R at 12.  Indeed, the discovery requests served on the Defendants are in fact different than the document requests contained in the improper subpoena to GTM.  While the Special Master does identify several reasons why the GTM documents are *not* responsive to the discovery requests to the Defendants upon which PPTT relies for the relief it seeks, the Special Master does not identify which of the discovery requests to the Defendants would have warranted production of those limited GTM documents.  *See* R&R at 11-12.  Indeed, the Defendants maintain that the remaining 26 documents identified in the R&R are *not* responsive to any of PPTT's discovery requests, including for the reasons described in the R&R.  For instance, the R&R states that "[b]ased on a review of the GTM Documents and a fair reading of PPTT's document requests, Paragraphs 1(10) and 1(15) do not appear to apply to most of the GTM Documents for the reasons indicated above [GTM was not an end-user of the Defendants' services]; Paragraphs 1(20) and 21 are not applicable to most of the documents because the phrase 'advertising and/or marketing materials' can fairly be construed narrowly; and Paragraph 4 applies to few of the documents if the phrase 'payment arrangements' is regarded as referring to actual, as opposed to potential or proposed, payment arrangements, which the Special Master regards as a reasonable interpretation of that request as it is written."  *See* R&R at 12.

Of the remaining GTM documents, 2 (duplicates) relate to an inquiry *from GTM* as to whether Black Lung Excise tax projects might be worthwhile, and as to which the Defendants replied in the negative in the same emails, *see* GTM00012, GTM00863; 1 relates to a draft e-mail *GTM* intended to send to Oracle (a company neither the Defendants nor PPTT has ever performed services for), *see* GTM01862; Manning Decl. ¶ 20; Steele Decl. ¶ 9;[11] and 3 relate to an *unsuccessful* attempt *by GTM* to obtain Section 199 work from Glaxo Smith Kline, who has never

---

[11] The Defendants nevertheless produced a substantially similar e-mail.  *See* Manning Decl. ¶ 21 (citing DPAD00001535-DPAD00001536).

been a client of the Defendants, *see* GTM00993, GTM01674, GTM01678; Manning Decl. ¶ 22; Steele Decl. ¶10.[12]  None of PPTT's discovery requests concern unpursued Black Lung Excise tax projects, unsuccessful attempts to pursue Oracle, or unsuccessful attempts to pursue Glaxo Smith Kline. *See* ECF No. 153-2.  Therefore, these GTM documents are non-responsive.

2 of the remaining GTM documents relate to Globus Medical and 2 relate to MSA.  None of PPTT's discovery requests specifically concern either of these companies, and neither company has ever been a PPTT client or even been pursued by PPTT to become a client. *See* ECF No. 153-2; Manning Decl. ¶ 24; Steele Decl. ¶ 11.  The 2 documents relating to Globus Medical consist of an e-mail and a PowerPoint deck, neither of which contain any information relating to marketing or payment but rather consist solely of confidential, substantive company financial information related to a tax analysis. *See* GTM00495-GTM00496; Manning Decl. ¶ 25.  The 2 documents relating to MSA also consist of an e-mail and a PowerPoint deck, neither of which contain any information relating to marketing or payment but rather consist solely of confidential third-party company information. *See* GTM00742-GTM00743; Manning Decl. ¶ 26.  Last, of the remaining GTM documents, 3 relate to the determination that there was *not* an opportunity to perform Section 199 work for Aqua America, who has never been a client of the Defendants or PPTT, *see* GTM00332, GTM00350, GTM00356; Manning Decl. ¶ 27; Steele Decl. ¶ 12, and 13 of the documents relate to an *unsuccessful* attempt to pursue Section 199 work from Intel,[13] a company

---

[12] The Defendants nevertheless produced a PowerPoint entitled "Glaxo Section 199 Briefing". *See* Manning Decl. ¶ 23 (citing DPAD0000976-DPAD0000980).

[13] These 13 documents relating to Intel are: GTM00129, GTM00679, GTM00680, GTM00762, GTM00777, GTM00901, GTM00997, GTM01281, GTM01374, GTM01394, GTM01536, GTM01851, GTM01862.  The Defendants have nevertheless produced at least 2 of these Intel documents in comparable form. *See* Manning Decl. ¶ 29 (citing the following DPAD documents); *compare* GTM01374 *with* DPAD0000523; *compare* GTM01436 *with* DPAD0000493-DPAD0000494.  The Defendants have also produced at least 2 documents reflecting the same substance as 2 of these Intel documents. *See* Manning Decl. ¶ 30 (citing the following DPAD documents); *compare* GTM000129 *with* DPAD0000487-DPAD0000489; *compare* GTM01862 *with* DPAD0000994-DPAD0000995.  Last, GTM01851 concerns GTM's thoughts regarding marketing, *not* the Defendants'. *See* Manning Decl. ¶ 31.

that has never been a client of the Defendants or PPTT, *see* ECF No. 165 at 8; Manning Decl. ¶ 28; Steele Decl. ¶ 13; October 13, 2020 PPTT/Sweet Deposition Transcript Excerpts, attached as **Exhibit 4**, at 220:8-13; PPTT/Sweet Depo. Tr. Vol. II at 518:6-522:21.  These documents are non-responsive per the reasoning in the R&R and, of course, have nothing to do with this case, which cannot be lost in the waves of unnecessary briefing on irrelevant issues.  In sum, *none* of the GTM documents the Special Master determined to be responsive to PPTT's discovery requests were in fact responsive and thus cannot support a forensic examination.

IV.    **IN AWARDING PPTT FEES THE SPECIAL MASTER APPLIED THE INCORRECT LEGAL STANDARD AND RELIED UPON HIS EARLIER NON-BINDING OPINION REGARDING POTENTIAL FURTHER SEARCHES IF THE PARTIES COULD AGREE ON SUCH A PROTOCOL, WHICH THEY DID NOT .**

Last, the Special Master erred in recommending that PPTT be awarded its fees in pursing PPTT's Motions.  As discussed above, PPTT's Motions should be denied, and, therefore, PPTT should not be awarded its fees associated with PPTT's Motions.  In any event, the R&R does not discuss, let alone apply, the correct legal standard under which a request for attorneys' fees should be evaluated.  Rather, the Special Master recommends that PPTT be awarded its attorneys' fees under the belief that PPTT's Motions could "have been avoided had Defendants agreed to perform an additional search of their ESI for responsive documents[.]"  *See* R&R at 20.  The Special Master reasoned that had the Defendants performed that additional search, they would have borne the expenses in the normal course.  *Id.* at 21.  Not only is this finding untethered to the correct legal standard and the record, as discussed below PPTT's proposed nine (9) pages of search terms, which were concealed from the Special Master, were nothing short of absurd.  In sum, it is the Defendants, not PPTT, who should be awarded their attorneys' fees in opposing PPTT's Motions.

A. **The Special Master Applied the Incorrect Legal Standard in Recommending an Award of PPTT's Attorneys' Fees—the Same Legal Standard the Special Master Previously Determined Was Inapplicable to a Request for Attorneys' Fees in This Identical Context.**

In the Special Master's Report and Recommendation denying PPTT's first motion to compel a forensic examination, the Special Master determined that "[b]ecause PPTT's Motion requests the imposition of discovery related sanctions, Fed. R. Civ. P. 37(b)(2)(C) is the applicable provision for determining whether any party is entitled to an award of fees and costs in connection with PPTT's Motion." *See* ECF No. 137 at 25. The Special Master determined that fees were not recoverable because there was no "disobedient party" against whom fees could be awarded within the meaning of that rule. *Id.* In this R&R, however, the Special Master now cites Fed R. Civ. P. 37(a)(5)(A)—the standard he previously determined was *inapplicable* to the same requested fee relief he now recommends be awarded to PPTT. *Compare* R&R at 20-21 *with* ECF No. 137 at 25. The Special Master never explains his change in course on the legal standard applicable to PPTT's identical requests for attorneys' fees (or, for that matter, the legal standard applicable to the *sanction* of ordering a forensic examination). As discussed above, the Defendants have *never* been found to have committed a discovery violation—including in this R&R. Therefore, applying Fed. R. Civ. P. 37(b)(2)(C)—the same rule the Special Master applied to PPTT's request for sanctions in the first motion to compel a forensic examination—there is, as was the case then, no "disobedient party" in the Special Master's own words. *See* ECF No. 137 at 25.

B. **Nevertheless the Special Master Misapplied this Incorrect Legal Standard in Recommending an Award of PPTT's Attorneys' Fees.**

Nor does the Special Master even quote or otherwise apply the plain language of the different rule upon which he now relies in the R&R—Fed. R. Civ. P. 37(a)(5)(A). Under Fed. R. Civ. P. 37(a)(5)(A), when a motion to compel is granted, a court "must, after giving an opportunity

to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees."  However, the court "must not order this payment if: (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an awarded of expenses unjust."  *Id.* Substantial justification requires justification "to a degree that could satisfy a reasonable person." *Bosire v. Passaic County*, No. 12-6498, 2017 WL 4532157, at *2 (D.N.J. Oct. 10, 2017) (citing *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)).  The test of substantial justification requires a "genuine dispute, or if reasonable people could differ as to [the appropriateness of the contested action]."  *Pierce*, 487 U.S. at 565.

As this Court knows, more than a year ago on March 16, 2020, PPTT and the Defendants submitted their Fed. R. Civ. 26(f) Report of the Parties, in which the parties agreed that there was no need to complete an ESI discovery plan, including a protocol for the preservation of electronic data and/or potentially relevant ESI.  *See* ECF No. 30 at 5.  In denying PPTT's first motion to compel a forensic examination, the Special Master offered "*his view* that it would be reasonable for PPTT to request that Defendants perform another search of their ESI to identify additional responsive documents and to supplement their responses to PPTT's Requests as appropriate."  *See* ECF No 137 at 24 (emphasis added).  The Special Master did not *require* the Defendants to perform an additional search of their ESI, nor did the Court when it adopted the Special Master's Report and Recommendation.  *See* ECF No. 152.  While PPTT claims that the Defendants "outright refused" to conduct any further searches, *see* ECF No. 179 at 16, which the R&R relied upon, *see id.* at 20, PPTT concealed from the Special Master, as the R&R noted, the actual list of search

terms PPTT sent to the Defendants, *see id.* at 16 n.11.  This list of search terms is *nine* (9) pages

long and includes patently overly broad, harassing, and inappropriate search terms.  *See* February

4, 2021 E-Mail from David B. Willis, Esquire to Brad A. Funari, Esquire (demanding the search

terms "to be run by the defendants pursuant to the Court's order" and PPTT Search Terms,

collectively attached as **Exhibit 5**.  There was never a Court order requiring the Defendants to run

any such searches, and counsel for PPTT's proposed search terms recklessly ignore prior Court

orders limiting the temporal scope of discovery and relevant third parties.  PPTT's search terms

included *the independent, unrestricted phrases*: "Dan," "Steele," "Dan Steele," "John,"

"Manning," "John Manning," "DPAD," "DPAD Group," "PPTT," "Profit Point Tax

Technologies," "Profit Point Tax," "jmanning@profitpointtax.com,"

"dsteele@profitpointtax.com," "2006," "2007," "2008," "2009," "2010," "2011," "2012," "2013,"

"2014," "2015," "2016," "2017," "2018," "2019," "2020," "2021," "Pittsburgh," "asshole," and

"dickhead," among a host of others.  *Id.*  Simply put, PPTT's proposed search terms were not a

good faith attempt to resolve a discovery dispute but just another attempt to harass the Defendants

with yet another fishing expedition.  This Court recently and unequivocally denounced PPTT's

efforts to conduct such fishing expeditions by abusing available discovery tools.  *See* ECF No. 177

at 2 ¶ 2 ("The Court clearly stated [at the status conference] that the deposition is NOT a fishing

expedition and is limited to the Excelon [sic] project and post-release matters only.").  The

Defendants were therefore justified in refusing to perform the searches PPTT requested – which

go well beyond these and other bounds on discovery set by the Court throughout this contentious

litigation.  In proposing these search terms, PPTT did not attempt in "good faith" to obtain the

discovery subject to the motion without court action under Fed. R. Civ. P. 37(a)(5)(A)(i)—the rule

cited by the Special Master.  Rather, as discussed below, the facts demonstrate that not only were

the Defendants substantially justified in opposing PPTT's Motions, *see* Fed. R. Civ. P. 37(a)(5)(A)(ii) and (iii), but the Defendants should be awarded their reasonable attorneys' fees in opposing them, *see* Fed. R. Civ. P. 37(a)(5)(B).

> **C.     The Boston Documents Warrant the Court Granting the Defendants Their Attorneys' Fees Incurred in Opposing PPTT's Motions.**

With respect to the Boston Documents, PPTT possessed them for over a month (and perhaps considerably longer) before it filed its first motion seeking the *exact* same relief as in PPTT's Motions, but PPTT chose not to include them in that first motion.  *See* R&R at 8 n. 6 ("It is unclear why Defendants' alleged failure to produce the Boston Documents, documents that PPTT indicates were received by its counsel on or about October 26, 2020, was not included as a basis for the relief sought by PPTT in its First Motion [filed on December 3, 2020]").  Consistent with its underhanded motives, PPTT *elected* not to present a single Boston Document to the Defendants during their depositions; *elected* not to ask the Defendants a single question regarding the Boston Documents during their depositions; and *elected* not to subpoena (or even contact) Deloitte, the entity identified as the *purported* sender of the Boston Documents on the envelope purportedly enclosing them.  PPTT continued to recklessly assert that Steele destroyed evidence, despite the fact that this claim has been flatly rejected by the Special Master and the Court.  PPTT failed to adequately meet and confer with the Defendants, instead ignoring the Defendants informal request for information relating to the origin of the Boston Documents—the meter tape to the envelope enclosing them—that was exclusively within the custody and control of counsel for PPTT and Sweet, and then vehemently stonewalling the Defendants' attempts to obtain that information at the continued deposition of PPTT and Sweet.  Last, *none* of the Boston Documents are even responsive to PPTT's discovery requests.

**D.     The GTM Documents Warrant the Court Granting the Defendants Their Attorneys' Fees Incurred in Opposing PPTT's Motions.**

With respect to the GTM documents, PPTT failed to provide the Defendants notice of *any* subpoena it served on GTM, in violation of Fed. R. Civ. P. 45.  The document subpoena that PPTT served on GTM on November 24, 2020 violated numerous Orders and directives of this Court, as counsel *for GTM* noted in its objections to the subpoena.  During the twenty-one (21) hours of the Defendants' depositions the week prior, PPTT presented none of the dozens of documents the *Defendants* produced to PPTT regarding GTM or asked the Defendants any meaningful questions regarding their relationship with, or projects procured through, GTM.  PPTT failed to notify the Court of its intention to file its motion to compel a forensic investigation relating to the GTM documents at the post-discovery status conference.  For the third time, PPTT falsely asserted that Steele destroyed evidence.  PPTT failed to present to the Court a *single* document produced by GTM (or the Defendants) that has any relevance to the claims or defenses in this case, instead relying almost exclusively on RFPs that are completely inapplicable to GTM given the nature of its business as a tax service *provider*.  Indeed, *none* of the GTM documents are responsive to PPTT's discovery requests.  In sum, for the multitude of reasons discussed above, the Court should award the Defendants their fees in opposing PPTT's Motions under Fed. R. Civ. P. 37(a)(5)(B).

<u>**CONCLUSION**</u>

For the foregoing reasons and those in their Briefs in Opposition to PPTT's Motions, the Court should reject the R&R, deny PPTT's Motions in their entirety, and award the Defendants their reasonable costs and attorneys' fees incurred in defending against PPTT's Motions.  By separate motion, the Defendants request oral argument on PPTT's Motions and these Objections.

Dated: March 25, 2021                              **REED SMITH LLP**

                                                   */s/ Brad A. Funari*
                                                   Brad A. Funari
                                                   Pa. I.D. No. 89575
                                                   Alex G. Mahfood
                                                   Pa. I.D. No. 324047
                                                   225 Fifth Avenue
                                                   Pittsburgh, PA 15222
                                                   (412) 288-3131

                                                   *Counsel for Defendants/Counter-Plaintiffs*
                                                   *DPAD Group, LLP, John Manning*
                                                   *and Daniel Steele*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 25, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel or parties of record electronically by CM/ECF.

*/s/ Brad A. Funari*