IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PROFIT POINT TAX TECHNOLOGIES, INC., | ) )  |
| Plaintiff, | ) ) Civil Action No. 19-698 ) District Judge William S. Stickman ) Magistrate Judge Maureen P. Kelly |
| v. | ) ) Re: ECF No. 258 |
| DPAD GROUP, LLP, JOHN MANNING, and DANIEL STEELE, | ) ) ) |
| Defendants. | ) ) |
| JOHN MANNING and DANIEL STEELE, | ) ) |
| Counter Claimants, | ) ) |
| v. | ) ) |
| PROFIT POINT TAX TECHNOLOGIES, INC. and PATRICK SWEET, | ) ) ) |
| Counter Defendants. | ) ) |

## REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

This case arises out of a dispute over who is owed fees for specialized income tax services work performed by John Manning ("Manning") and Daniel Steele ("Steele"). Plaintiff Profit Point Tax Technologies, Inc. ("PPTT") filed this action against Defendants Manning, Steele and DPAD Group, LLP ("DPAD") (collectively, "Defendants"). ECF No. 27. Manning and Steele, in turn, filed counterclaims against PPTT and its sole shareholder, Patrick Sweet ("Sweet"). ECF No. 101.

Presently before the Court is Defendants' Motion for Summary Judgment on the First Amended Complaint.[1] ECF No. 258. For the reasons that follow, it is respectfully recommended that the Court grant Defendants' Motion for Summary Judgment.

## II. REPORT

### A. FACTUAL BACKGROUND

#### 1. The Parties

PPTT is a service firm that works with companies to calculate income tax incentives for federal income tax purposes. ECF No. 273 ¶ 1. Sweet is the President, Chief Executive Officer, and sole shareholder of PPTT. Id. ¶ 2.

Steele and Manning are tax professionals. ECF No. 260 ¶ 11. They provide tax services related to domestic activity deductions under Section 199 of the Internal Revenue Code ("Section 199") and other related services. ECF No. 101 ¶ 20.

Steele became an independent contractor of PPTT in 2006 or 2007, and Manning became an independent contractor of PPTT in 2011. ECF No. 273 ¶ 4. Manning and Steele later formed their own tax services company, DPAD, in May 2015. ECF No. 260 ¶ 37.

#### 2. The Revenue Sharing Agreement

PPTT, Sweet, Manning and Steele entered into an oral Revenue Sharing Agreement ("RSA") around January 2011. Id. ¶ 13. The RSA governed how revenue generated from Manning and Steele's Section 199 tax services would be allocated and distributed. Id.

Under the RSA, the percentage of fees due to Manning and Steele was based on their: (1) identification and pursuit of target corporations; (2) securing agreements to perform services for those target corporations; (3) work performed identifying tax savings opportunities for such

---

[1] The parties have also filed cross Motions for Summary Judgment as to Manning and Steele's counterclaims. ECF Nos. 259 and 274. Those motions will be addressed in a separate Report and Recommendation.

2

corporations; (4) data collection; (5) tax computations; and (6) participating in Internal Revenue Service ("IRS") audits and appeals. Id. ¶ 14.

While parties to the RSA, Manning and Steele developed business, and PPTT entered into contracts with clients, or subcontracts with other firms ("alliance firms"), for the performance of Section 199 tax services on terms agreeable to Manning, Steele, Sweet and PPTT. Id. ¶ 21. When PPTT received fees from clients or alliance firms, it deposited them into a PPTT bank account controlled by Sweet. PPTT/Sweet paid any fees owed to Manning and Steele from this account. Id. ¶ 23.

Manning and Steele did not enter in a noncompete agreement with PPTT. They could work as independent contractors for other companies and work for their own company. Id. ¶ 19. If they marketed on their own behalf for non-PPTT clients, Manning and Steele did not need to inform PPTT. Id.

Beginning around June 2013, the parties began to have disputes over how to split fees. Id. ¶ 35. Manning and Steele claim the RSA was amended in October 2013, so that they would receive 100% of fees that PPTT received on projects procured by Manning and/or Steele, unless Sweet actually procured the client or did tax services. Id. ¶ 36. PPTT and Sweet deny that they agreed to this change. ECF No. 292 ¶ 36.

### 3. The Exelon Project

PPTT's claims arise out of allegations that it is entitled to fees for tax services work that Manning and Steele performed for Constellation Energy, a subsidiary company of Exelon (the "Exelon Project"), and that Defendants fraudulently concealed that fact from PPTT. ECF No. 27 ¶¶ 12-27.

3

Based on the record, in 2015, Manning and Steele solicited Exelon for Section 199 services through Thomas Terry ("Terry"), a senior tax professional at Exelon. ECF No. 260 ¶ 43. Terry had sole authority in the tax department to engage a tax services provider, and he reported to Jack Thayer ("Thayer")—then Chief Financial Officer of Exelon. Id. ¶¶ 44, 46; ECF No. 273 ¶ 6.

Thayer told Terry that former Governor Ridge, who was on Exelon's Board of Directors, had a couple of friends who provided Section 199 services, and Thayer told Terry to take a meeting with them. ECF No. 260 ¶ 48. During this exchange, Thayer and Terry referred to PPTT. Id. ¶ 61; ECF No. 263-10 at 25. At Terry's direction, his assistant e-mailed Manning and Steele at their PPTT email addresses to set up a meeting. ECF No. 263-10 at 90; ECF No. 260 ¶ 60.

On March 16, 2015, Terry and his colleagues met with Manning and Steele at Exelon's office in Chicago, Illinois to discuss a potential engagement to evaluate opportunities under Section 199. ECF No. 260 ¶ 47. Terry does not recall Manning and Steele referring to PPTT or any other entities they were affiliated with during the meeting; it was his understanding that Manning and Steele would do the work. Id. ¶¶ 58-59; ECF No. 263-10 at 9.

Terry, on behalf of Exelon, signed an engagement letter with DPAD—not PPTT—on April 15, 2015. ECF No. 260 ¶ 64. Defendants later received payment for completing this work in February 2019. ECF No. 292 ¶ 158.

PPTT asserts that it was entitled to a fee for Exelon as the contracting entity, and that its goodwill enabled Manning and Steele to obtain this work. ECF No. 292 ¶ 159. Since this time, Manning has stated in other litigation that he marketed Exelon as a PPTT project. Id. ¶ 160; ECF No. 292-3 ¶ 33.

4

### 4. Master Fee Splitting Agreement and Release

#### a. Negotiations

The parties continued to disagree over fee splitting into 2014 and 2015. Ultimately, they parted ways and Manning and Steele formed their own company, DPAD, in early 2015. ECF No. 260 ¶ 37.

In April 2015, the parties began negotiations about fee splitting for open projects. PPTT and Sweet were represented by legal counsel Ronald M. Trachtenberg ("Trachtenberg"). Id. ¶ 68. Manning, a licensed attorney, represented himself and Steele. Id. ¶ 72.

Both parties were to participate in compiling a list of open projects that were subject to fee splits. ECF No. 260 ¶ 73; ECF No. 292 ¶ 73. At Trachtenberg's request on July 16, 2015, Manning and Steele presented a list of what they believed were the projects for which fee splits should apply and how the fees should be allocated. ECF No. 260 ¶ 75; ECF No. 263-1 at 18. On July 17, 2015, Steele wrote to Manning: "Force [Sweet] to provide the list he knows nothing about. You'll need to clean up your account first." ECF No. 292 ¶ 151. Manning and Steele did not disclose the Exelon Project. Id. ¶ 152.

PPTT's counsel did, however, refer to Exelon during negotiations. On October 5, 2015, Trachtenberg sent Manning two emails, copying Sweet. In the first email, he claimed, among other things, to reserve PPTT's right to invoice DPAD for certain companies, including "Exelon/Constellation." ECF No. 260 ¶ 76; ECF No. 263-12 at 2. Later that same day, Trachtenberg offered that in exchange for certain concessions, "PPTT would agree not to pursue any amounts potentially or actually due PPTT on projects outside this Agreement, including, but not limited to: . . . Exelon/Constellation." ECF No. 263-13 at 2.

5

### b. Terms of the agreement

The parties' negotiations culminated in their signing a Master Fee Splitting Agreement and Release (the "Release") on February 2, 2016, in which they expressed their "desire to resolve all remaining fee splits on all projects that Manning and/or Steele have worked on as independent contractors for PPTT."[2] ECF No. 263-24.

The parties agreed that "[w]ith the exception of the Rockwater Energy Project and the [Hershey 2014 Project] . . . Exhibit A correctly states (i) all of the remaining projects as to which Manning and/or Steele claim or may claim a fee from PPTT (the 'Listed Projects'); (ii) the estimated gross remaining fee due on each Listed Project (the 'Estimated Gross Remaining Fee'), (iii) the actual percentage of each gross remaining fee due Steele from PPTT, and (iv) the actual percentage of each gross remaining fee due Manning from PPTT." Id. ¶ 1.

Except for the two projects listed above, the projects listed in Exhibit A were "accepted by each Party as the complete list of projects with respect to which any Party claims or may claim from any other Party a fee" and "each Party release[d] any claim against each other Party for fees for work done or claimed to have been done on behalf of any client." Id. ¶ 11.

The list of remaining projects in Exhibit A did not include the Exelon Project, and it was not expressly carved out of the Release.

### 5. Post-Release Communications/Disputes over Exelon Project

Several months after the Release was signed, Trachtenberg emailed Manning on May 24, 2016, copying Sweet, and indicated that Sweet was conducting an "investigation." ECF No. 292 ¶ 115. Trachtenberg wrote that during this investigation, Sweet discovered that Manning sent the following while with PPTT:

---

[2] The Release is signed by Sweet, Manning and Steele, individually and on behalf of PPTT and DPAD. ECF No. 263-24 at 5.

> [A]n email describing PPTT's history with Exelon where [he] stated that PPTT was introduced to Exelon by Ryan, a global tax services firm headquartered in Dallas, Texas. [Manning] also sent an email to Ridge Global regarding Exelon, where [he] stated that [he] w[as] representing [PPTT]. The email to Ridge Global was from [Manning's] PPTT email account, and the documents and presentations were identified as owned by PPTT. These documents and presentation were also provided to Exelon.

ECF No. 260 ¶ 115; ECF No. 263-25 at 2.

Trachtenberg's purpose in sending this email was to inform Manning that if Manning pursued his right to recovery on the Hershey 2014 Project,[3] it could result in litigation involving a claim by PPTT for fees related to Exelon. ECF No. 292 ¶ 117. On August 1, 2016, Trachtenberg also emailed non-party Tom Santone, copying Sweet, regarding "what now appears to be inevitable litigation," in which he similarly described Manning's contacts with Exelon. ECF No. 292 ¶ 118; ECF No. 263-26.

On August 19, 2016, Sweet emailed non-parties Ken Urish and Rocco Romano asserting that PPTT would be entitled to 40 percent of the fees associated with the Exelon Project and that an invoice was past due. ECF No. 260 ¶ 120.

On July 1, 2016, Manning filed a Complaint against Sweet and PPTT in the Circuit Court of Montgomery County, Maryland (the "Maryland Litigation"). ECF No. 273 ¶ 8. On February 27, 2017, PPTT filed counterclaims in the Maryland Litigation against Manning and DPAD arising out of allegations that, *inter alia*, Manning solicited Exelon on behalf of PPTT, and then transferred this client to DPAD without informing PPTT. ECF No. 263-30 ¶¶ 11-18. PPTT also claimed that Manning failed to inform PPTT of the existence of the Exelon Project when the parties negotiated the Release and, as a result, "Exelon was not included in the fee splitting agreement intended to resolve disputed fees." Id. ¶ 13.

---

[3] The Hershey 2014 Project is one of two projects expressly carved out of the Release. Manning and Steele have counterclaimed relative to allegedly unpaid fees for the Hershey 2014 Project. ECF No. 101.

7

### B. PROCEDURAL HISTORY

#### 1. PPTT's Pleadings/Motions to Dismiss

PPTT filed this action on June 14, 2019. ECF No. 1. Defendants moved to dismiss Plaintiff's Complaint. ECF No. 15. A Report and Recommendation was entered, recommending that the Motion to Dismiss be granted and part and denied in part, with leave to amend. ECF No. 23. The Honorable William S. Stickman adopted the Report and Recommendation, and PPTT subsequently filed the operative First Amended Complaint on March 6, 2020. ECF Nos. 24 and 27.

In the First Amended Complaint, Plaintiff asserted seven claims: Breach of Contract (Count I); Breach of Fiduciary Duty (Count II); Unjust Enrichment (Count III); Tortious Interference with Prospective Contractual Relations (Count IV); Conversion (Count V); Intentional Misrepresentation (Count VI); and Negligent Misrepresentation (Count VII). ECF No. 27. Counts I and II are asserted against Manning and Steele, only.

Defendants again moved to dismiss Plaintiff's claims. ECF No. 32. The undersigned submitted a Report and Recommendation, recommending that (1) Count IV (Tortious Interference with Prospective Contractual Relations) and Count V (Conversion) be dismissed against all Defendants pursuant to the gist of action doctrine; and (2) Count III (Unjust Enrichment) be dismissed with respect to Manning and Steele, only. ECF No. 70. The Honorable William S. Stickman adopted the Report and Recommendation and entered an Order dismissing Counts IV and V against all Defendants and Count III against Manning and Steele. ECF No. 100.

#### 2. PPTT's Claims

Based on the disposition of the Motions to Dismiss, PPTT now has five pending claims: Breach of Contract (Count I) (against Manning and Steele, only); Breach of Fiduciary Duty (Count

8

II) (against Manning and Steele, only), Unjust Enrichment (Count III) (against DPAD, only); Intentional Misrepresentation (Count VI); and Negligent Misrepresentation (Count VII). ECF No. 27 ¶¶ 28-42, 52-61.

As relief, PPTT requests compensatory, consequential, and punitive damages; attorneys' fees and costs; an order that Defendants be "disgorged of all profits Defendants realized or will realize as a consequence of their unauthorized disclosure or use of PPTT's" information or other misconduct; an accounting of compensation received by Defendants for all tax services clients; and any other relief the Court deems appropriate. Id. at 10.

### 3. Counterclaims

Defendants filed an Answer to the First Amended Complaint, in which Manning and Steele asserted counterclaims against PPTT and Sweet arising out of allegedly unpaid fees relative to five tax services projects (not including Exelon). ECF No. 101 ¶¶ 72-101. PPTT and Sweet filed an Answer to Defendants' counterclaims on September 1, 2020. ECF No. 110.

### 4. Fact Discovery

The Court entered a Case Management Order, scheduling fact discovery to conclude by October 4, 2020. ECF No. 37. Various discovery disputes ensued, which led to the appointment of a special master, Michael J. Betts, to review motions relating to discovery and to submit reports and recommendations as to the disposition of those motions, and to directing a forensic examination of Manning and Steele's devices. ECF Nos. 112 and 187.

The fact discovery deadline was extended multiple times, until April 1, 2021. ECF Nos. 125, 134, 150, 176. After this time, however, limited discovery continued under the Court's direction relative to the forensic examination of Manning and Steele's devices. ECF Nos. 235. All fact discovery was completed by May 25, 2022. ECF No. 247 ¶ 5.

9

### 5. Pending Motions

After fact discovery concluded, the parties cross-moved for summary judgment relative to Manning and Steele's counterclaims. ECF Nos. 259 and 274. PPTT also filed a pending Motion for Sanctions, ECF No. 266, in which it requests default judgment on PPTT's direct claims. Those motions will be addressed by separate Reports and Recommendations.[4]

On July 31, 2022, Defendants filed the instant Motion for Summary Judgment on the First Amended Complaint, together with a Brief in Support. ECF Nos. 258 and 261. Defendants also filed a Concise Statement of Material Facts and supporting Appendix. ECF Nos. 260 and 263. The parties subsequently filed a Joint Statement of Material Facts. ECF No. 273.

On September 26, 2022, PPTT filed a Response in Opposition to Defendants' Motion for Summary Judgment and a Response to Defendants' Concise Statement of Material Facts. ECF Nos. 285 and 292.

Defendants filed a Reply Brief in support of the Motion for Summary Judgment on October 10, 2022. ECF No. 293. PPTT and Sweet then filed a Sur-Reply. ECF No. 297.

Defendants' Motion for Summary Judgment is now ripe for consideration.

### C. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact,

---

[4] The Motion for Sanctions has been referred to Special Master Michael J. Betts.

viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof"). Thus, summary judgment is warranted where, "after adequate time for discovery and upon motion . . . a party . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

The moving party bears the initial burden of demonstrating to the Court that there is an absence of evidence to support the non-moving party's case. Celotex, 477 U.S. at 322; Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004). "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. Matreale v. N.J. Dep't of Mil. & Veterans Affairs, 487 F.3d 150, 152 (3d Cir. 2007); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001).

**D. DISCUSSION**

In support of the Motion for Summary Judgment, Defendants argue that all of PPTT's claims are barred by the Release, which resolved all fee disputes among the parties. If PPTT relies on allegations of fraud to set aside the Release, Defendants argue that PPTT has waived any

challenge to the Release by failing to return the consideration it received, and that it has no viable claim for intentional misrepresentation. But even if the Court were to set aside the Release, Defendants assert that PPTT is not entitled to any fees for the Exelon project because PPTT did not solicit Exelon or provide services for this project. ECF Nos. 259 and 293.

In response, PPTT argues that the Court should disregard the Release language because the Release was procured by fraud. PPTT also argues that summary judgment should not be granted because there are questions of material fact relative to its misrepresentation claims and whether PPTT is entitled to any fee for the Exelon Project under the RSA.[5] ECF Nos. 285 and 297.

Because the parties' arguments at summary judgment broadly hinge on whether PPTT asserts a viable claim of fraud, the Court begins by addressing PPTT's intentional misrepresentation claim in Count VI.

### 1. Intentional Misrepresentation (Count VI)

PPTT asserts a claim for intentional misrepresentation at Count VI, alleging that Defendants made "false or misleading representations" regarding the "client projects that would be subject to the [Release] in order to "induce PPTT to sign the [Release] without any compensation relating to the omitted clients." ECF No. 27 ¶¶ 53-57.

Under Pennsylvania law, the elements of intentional misrepresentation (also known as fraudulent misrepresentation) are: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, which knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the

---

[5] PPTT also argues that Defendants have concealed discovery materials, and that the outcome of its Motion for Sanctions is directly relevant to this pending motion. ECF No. 285 at 2. Because the Motion for Sanctions has been referred to Special Master Betts, the Court does not address those allegations here.

misrepresentation; and (6) the resulting injury was proximately caused by the reliance. Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994).

Defendants raise multiple arguments in support of summary judgment on this claim, including that it is barred by Pennsylvania's two-year statute of limitations for fraud claims.[6] ECF No. 261 at 18. On this point, Defendants assert that PPTT knew of facts giving rise to its claim as early as when the Release was signed on February 2, 2016 (citing Trachtenberg's October 2015 emails referring to "Constellation/Exelon" during the negotiations). Id. at 17-18. Defendants also refer the Court to (1) emails sent by Trachtenberg and Sweet in March and August 2016, which include suggestions that Manning solicited Exelon on behalf of PPTT, and that PPTT was entitled to fees for the Exelon Project, and (2) to PPTT's counterclaims in the 2017 Maryland Litigation, which were based on the same allegations as this lawsuit. Id. at 18-20. Because this record reflects PPTT's knowledge of its claim more than two years before this lawsuit was filed on June 14, 2019, Defendants argue, PPTT's claim is untimely.

In response, PPTT disputes that this claim is untimely. ECF No. 285 at 13. PPTT contends that Defendants purposefully prevented PPTT from learning about Exelon or other potential projects. Id. PPTT asserts that it did not know the Exelon Project was an active project for which it was entitled to fees when it signed the Release. Id. at 11-12. PPTT also argues that its claim was not ripe until Exelon actually paid for this project in February 2019, and that PPTT timely filed this action within two years of that date. Id. at 13-14.

---

[6] Defendants also argue that PPTT's intentional misrepresentation claim fails because: (1) the Release contains an integration clause; (2) PPTT cannot show justifiable reliance on any misrepresentation; (3) for a claim based on an omission, there must be a duty to speak, and Defendants had no such duty here; (4) PPTT was aware of the Exelon project during the negotiation of the Release; and (5) PPTT has retained the consideration it received under the Release. ECF No. 261 at 10-21. Because the Court should find that this claim is time barred, it is not necessary to consider the remaining arguments.

Under Pennsylvania law, a party has two years to sue for fraud. SodexoMAGIC, LLC v. Drexel Univ., 24 F.4th 183, 218 (3d Cir. 2022) (citing 42 Pa. C.S.A. § 5524(7)). This period begins to run when a cause of action accrues. Id. A cause of action accrues when "an injury is inflicted and the corresponding right to institute a suit for damage arises." Id. (quoting Gleason v. Borough of Moosic, 15 A.3d 479, 484 (Pa. 2011)). "[I]n fraudulent inducement, the injury is the entry into the contract and the forsaking of other contracts." Margarite v. HRN Corp., No. Civ. A. 93-1379, 1993 WL 283980, at *3 (E.D. Pa. July 21, 1993).

Because PPTT claims that it was fraudulently induced to enter into the Release, PPTT's alleged injury occurred when it entered into the Release, on February 2, 2016. While Pennsylvania's discovery rule tolls the statute of limitations for the period that "an injury or its cause [are] not reasonably knowable," the record reflects that PPTT was on notice of facts giving rise to its claim as early as 2016. SodexoMAGIC, 24 F.4th at 218 (quoting In re Risperdal Litig., 223 A.3d 633, 640 (Pa. 2019)). As Defendants point out, the record contains multiple emails from Sweet and PPTT's counsel, Trachtenberg, in May and August 2016 suggesting that Manning solicited Exelon on behalf of PPTT, and that PPTT was entitled to fees for this project.

But certainly, PPTT learned of its claim no later than February 27, 2017, when it brought claims based on substantially similar allegations in the Maryland Litigation. Because PPTT did not bring this lawsuit until more than two years later, on June 14, 2019, this claim is barred by the statute of limitations. Accordingly, Defendants' Motion for Summary Judgment should be granted as to PPTT's intentional misrepresentation claim in Count VI.

## 2. Breach of Contract (Count I), Breach of Fiduciary Duty (Count II), Unjust Enrichment (Count III) and Negligent Misrepresentation (Count VII) Claims

As for its remaining claims, PPTT asserts claims for breach of contract (Count I), breach of fiduciary duty (Count II), unjust enrichment (Count III), and negligent misrepresentation (Count VII). These claims arise out of allegations that Defendants breached the RSA by soliciting clients on behalf of PPTT and unjustly retaining those profits, and that they negligently misrepresented projects that should have been included in the Release. ECF No. 27 ¶¶ 28-42, 51-61.

In support of the Motion for Summary Judgment, Defendants argue, and PPTT does not contest, that all these claims are precluded by the terms of the Release—in particular, that the Release sets forth the complete list of projects[7] from which "any Party claims or may claim from any other Party a fee," and expressly "releases any claim against each other Party for fees for work done or claimed to have been done on behalf of any client." ECF No. 261 at 11-12.

The parties only dispute whether the Release language should be "set aside" based on Defendants' fraud. ECF No. 285 at 3. Because Defendants' alleged fraud does not support invalidating the Release, however, the Court should grant the Motion for Summary Judgment as to PPTT's remaining claims.

In this case, PPTT claims that Defendants fraudulently induced it to enter into the Release. Under Pennsylvania law, a contract induced by fraud is not automatically void; it is merely voidable. <u>Markowicz v. SWEPI LP</u>, 940 F. Supp. 2d 222, 229 (M.D. Pa. Apr. 12, 2013). As the Court previously recognized, a victim of fraud in the inducement has two options: (1) rescind the contract; or (2) affirm the contract and sue for damages." ECF No. 70 at 19[8] (citing <u>Eigen v. Textron Lycoming Reciprocating Engine Div.</u>, 874 A.2d 1179, 1184 (Pa. Super. 2005)). If a party

---

[7] This statement is with the exception of two projects carved out of the Release, which are not relevant here.

[8] This Report and Recommendation was adopted at ECF No. 100.

chooses to affirm the contract, it "it is not a waiver of the fraud; nor does it bar the right to recover" but "it does bar a subsequent recission." Eigen, 874 A.2d at 1184 (quoting Scaife Co. v. Rockwell-Standard Corp., 285 A.2d 451 (Pa. 1971)).

"Recission is an annulment or unmaking of a contract and a restoration of the status quo whereas damages, a legal remedy, involves an affirmance of the contract." Wolgin v. Smith, No. Civ. A 94-7471, 1996 WL 355338, at *3 (E.D. Pa. June 21, 1996). "[T]o obtain a recission, the party must act promptly upon discovery of the fraud to restore or tender any benefit received or the right to rescind is waived." Id.

Because PPTT only claims fraud in the inducement of the Release, this does automatically render the Release void. And PPTT proffers no other basis for the Court to grant the equitable remedy of rescission. For the reasons discussed, PPTT does not assert any claim of fraud on which relief can be granted.[9] PPTT also admits that it has not tried to restore the parties to their pre-Release status quo, arguing, in fact, this would not have been feasible because PPTT received its portion of the agreed-upon fees from third parties.

With no dispute that the terms of the Release bar PPTT's remaining claims, and without any basis to disregard those terms, the Court should grant summary judgment as to PPTT's remaining claims, at Counts I, II, III and VII.

### E. CONCLUSION

For the foregoing reasons, it is respectfully recommended that the Court grant Defendants' Motion for Summary Judgment on the First Amended Complaint, ECF No. 258.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), and Local Rule 72.D.2, the parties are permitted to file written objections in accordance with the schedule

---

[9] The Court also notes that PPTT has not expressly requested rescission as relief in its First Amended Complaint. ECF No. 27 at 10.

16

established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file objections will waive the right to appeal. Brightwell v. Lehman, 637 F.3d 187, 193 n. 7 (3d Cir. 2011). Any party opposing objections may file their response to the objections within fourteen (14) days thereafter in accordance with Local Civil Rule 72.D.2.

Dated: January 23, 2023

Respectfully submitted,

/s/ Maureen P. Kelly
MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

cc: Honorable William S. Stickman,
United States District Judge

All counsel of record via CM/ECF.